## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**THOMAS L. DAVIS,**

               **Plaintiff,**         **:**

     **v.**

**MASSACHUSETTS MUTUAL**
**LIFE INSURANCE COMPANY,**     **:**

               **Defendant.**

**Case No. 2:20-cv-843**
**Judge Sarah D. Morrison**
**Magistrate Judge Elizabeth A.**
**Preston Deavers**

## OPINION AND ORDER

On June 18, 2019, Defendant Massachusetts Mutual Life Insurance Company (Mass Mutual) stopped paying disability benefits to Plaintiff Thomas L. Davis under Policy Number 4850473. After an unsuccessful internal appeal, Mr. Davis filed suit asserting claims for breach of contract, breach of the duty of good faith, and promissory estoppel. (Compl., ECF No. 1.) Mass Mutual now moves for summary judgment on all claims. (Mot. Summ. J., ECF No. 55.) Each party has also filed a motion to exclude their adversary's proffered expert testimony. (ECF Nos. 56, 76, 77.) The motions are fully briefed and ripe for decision. For the reasons set forth below, Mass Mutual's Motion for Summary Judgment is **GRANTED**. Mass Mutual's Motion to Exclude Testimony of Dr. Cathy Della Mora is also **GRANTED**. Mr. Davis's Motion to Exclude Testimony of Dr. J. Robert Yohman and Mass Mutual's Motion to Strike are **DENIED as moot**.

## I.    BACKGROUND

### A.    The Policy

After graduating from law school in 1982, Mr. Davis joined the small firm where he had worked as a law clerk. (Davis Dep., ECF No. 71-1, 13:11, 30:10–16.) He developed a trial practice and, in 1987, became a partner of the firm. (*Id.*, 30:17–23, 33:19–22.)

In 1989, Mr. Davis purchased himself a disability insurance policy from Mass Mutual's predecessor-in-interest. (Policy, ECF No. 55-1, PAGEID # 230.) The Policy provides, in relevant part:

**PART 1—DEFINITIONS**

*In PART 1, we defined several terms used in this policy.*

\*\*\*

**Sickness**: A sickness or disease that first appears (makes itself known) on or after the effective date. . . .

\*\*\*

**Occupation**: Your regular occupation at the start of disability.

**Doctor**: A licensed medical practitioner other than the insured.

\*\*\*

**PART 2—DISABILITY BENEFITS**

*In PART 2, we discuss the different kinds of disability covered and the benefits provided for each. We'll pay only one benefit at a time.*

\*\*\*

**Total Disability.** You're totally disabled if because of sickness or injury you can't do the main duties of your occupation. You must be under a doctor's care.

\*\*\*

**Total Disability Benefit.** You must be totally disabled and have been totally and/or partially disabled for the full waiting period. We'll pay the first monthly benefit one month after the waiting period ends. You'll get benefits as long as you're totally disabled. But we'll pay only up to the maximum benefit period. You won't get a larger benefit if you're disabled due to more than one cause.

\*\*\*

## <u>PART 4—CLAIMS</u>

*There are certain things you must do when making a claim. In PART 4, we discuss these requirements. We also discuss payment of claims.*

**How To Make A Claim**

**Notice of Disability.** Send a written notice of your disability to our Home Office or to one of our authorized agents. Send it within 20 days after the start of disability or as soon as reasonably possible. There's no required form.

**Claim Forms.** We'll then send you a claim form. If you don't receive one within 15 days after you sent notice, write us your own claim letter. Tell us what cause the disability. Describe your situation.

**Required Proof.** Whether on our claim form or your claim letter, send proof of your disability and any proof of reduced income that may be required. Send it to our Home Office as soon as possible. Required proof must also be received within 90 days of each monthly benefit payment claimed. If it's not possible to send it within 90 days, send it as soon as reasonably possible. Your claim won't be reduced because of the delay. But we won't accept proof of loss later than 1 year after it was due. We'll make an exception if you weren't then competent to make the claim.

We may require from time to time that you be examined by doctors we choose. We'll pay the cost. We may also require from time to time, satisfactory proof of your income before and during the disability. This may include, but is not limited to, copied of your W-2 form and/or income tax returns.

(*Id.*, PAGEID # 229–31.)

3

**B.      Mr. Davis completed inpatient and intensive outpatient courses of treatment for alcohol dependence in 2015.**

Mr. Davis first presented at The Woods at Parkside for inpatient alcohol dependence treatment on May 27, 2015. (*See* ECF No. 55-4, PAGEID # 292.) After a subsequent course of intensive outpatient therapy, he was discharged on July 31. (*Id.*) Mr. Davis's discharge assessment from Parkside staff states:

> Tom completed the [intensive outpatient] level of care for chemical dependency. He achieved all of his treatment objectives. He is with his wife and reports this environment is healthy for his recovery. He has to follow up with his physician for his emotional and physical needs. He will be doing continuing care at Parkside starting on 8-3-15. He is a low relapse risk and his prognosis is good.

(*Id.*, PAGEID # 293.)

Throughout the relevant time period, Mr. Davis has regularly seen his primary care physician, Stephen Davakis, M.D. Dr. Davakis mentions Mr. Davis's alcohol use for the first time in a treatment note dated June 15, 2015:

> Patient comes in for followup after his recent inpatient alcohol rehabilitation stay. He was involuntarily admitted to Parkside rehabilitation center, and he spent 2 weeks there. He had been abusing alcohol for quite some time, and this accelerated back in February. His weight gain and other medical issues were related to his alcohol abuse, which he was concealing from his family and his physicians. After going through his inpatient rehabilitation, he is feeling better overall. He is getting intense outpatient counseling, about 9 hours a week. His only complaint today was his ongoing problems with knee pain related to his torn meniscus. He is following with orthopedics for this. He feels his depression/anxiety symptoms are stable. He denies any suicidal or homicidal ideation. He denies chest pain, chest pressure, shortness of breath or anything suspicious for cardiac symptoms. No other complaints or concerns today.

(ECF No. 69-4, PAGEID # 1550.)

4

Mr. Davis saw Dr. Davakis three more times in 2015. (*See id.*, PAGEID # 1543–49.) At the October 15, 2015 visit, Dr. Davakis noted that Mr. Davis had "some mild/moderate cognitive problems, including some short-term memory issues and concentration issues. These are slowly improving since stopping his alcohol abuse." (*Id.*, PAGEID # 1543–44.)

At his next visit, Dr. Davakis performed a mental status screening (the Mini-Mental State Exam or MMSE), on which Mr. Davis scored a 27/30, causing Dr. Davakis to note "deficits in memory recall." (*Id.*, PAGEID # 1541–42.)

Mr. Davis continued to visit Dr. Davakis every one-to-three months through 2016. (*Id.*, PAGEID # 1532–40.) At their November 15, 2016 visit, Dr. Davakis noted:

> He feels that his depression/anxiety symptoms are fairly stable. He unfortunately is continuing to have problems with memory and concentration. This has been fairly constant over the past year. He was hoping that this would improve the longer he was off alcohol. He did get some initial improvement, but this seems to have plateaued. . . . We talked about possibly seeing neurology regarding his memory and cognitive issues. . . .

(*Id.*, PAGEID # 1532.) Treatment notes state that a neurology referral was sent. (*Id.*, PAGEID # 1533.)

Mr. Davis visited Dr. Davakis twice in 2017 and twice in 2018, with no major changes in status. (*Id.*, PAGEID # 1528–31.)

### C. Mr. Davis filed a claim for benefits in June 2015. Mass Mutual approved the claim the following month.

Almost immediately after being admitted at Parkside, Mr. Davis applied for total disability benefits under the Policy. (*See* ECF No. 55-3.) His Claim Form

identifies the following impairments: alcohol use, hyperthyroidism, high blood pressure, essential tremors, and a meniscus tear. (*Id.*, PAGEID # 285.) It further provides that Mr. Davis was unable to perform the duties of his occupation due to "impaired judgment, unable to drive, stress induced drinking, anxiety due to pressures of running a business." (*Id.*, PAGEID # 288.) The accompanying statement by Dr. Davakis, provides additional detail:

> **Primary diagnosis:** Alcoholism
> **Secondary diagnosis:** Major depression
> **Diagnostic tests performed:** Psychiatric evaluation, admission to rehabilitation hospital (5-27-15)
> **Objective findings:** Chronic history of [alcohol] abuse
> **Subjective symptoms:** Depressed mood, anxiety, inability [to] focus / concentrate
> **Prognosis:** Fair/guarded

(*Id.*, PAGEID # 289.) Dr. Davakis explained that Mr. Davis was "unable to perform work of any kind," as he was "undergoing intensive rehab for alcohol dependence (inpatient), and psychiatric therapy for depression." (*Id.*, PAGEID # 290.) He opined that Mr. Davis would "possibly" be able to return to work on a part-time basis in October 2015. (*Id.*)

Mass Mutual approved Mr. Davis's claim on July 8, 2015. (ECF No. 55-5.) The determination letter provides:

> We are pleased to inform you that your claim for disability benefits has been approved as a sickness under policy number 4850473. Please note the maximum benefit period is to Age 65, as long as you remain eligible under the terms and conditions of your contract.
>
> We have accepted February 1, 2015 as the commencement date of disability. The 30-day waiting period under the above policy expired on March 2, 2015 and benefits began accruing on a per diem basis on March 3, 2015. Benefits on a continuing claim are paid at the end of each monthly benefit period. . . . Going forward, we will process a

monthly benefit in the amount of $3,600.00, on [or] around the 26th of
every month, as long as you continue to meet the definition of Total
Disability as outlined in your policy.

(*Id.*)

> **D.  Four years later, Mass Mutual concluded that Mr. Davis's
> impairments no longer limited his ability to work, and
> terminated his benefits.**

The record reflects that Mass Mutual tracked Mr. Davis's treatment and

recovery after approving his claim—it received Attending Physician Statements

from Dr. Davakis, compiled treatment notes from Mr. Davis's various providers, and

assigned expert consultants to conduct periodic file reviews. (*See, e.g.*, ECF Nos. 55-

7–55-12.)

> **1.  Dr. Higgins — June 3, 2016**

In a report dated June 3, 2016, Mass Mutual medical consultant, Thomas

Higgins, M.D., summarized his review of Mr. Davis's file. (ECF No. 55-8.) He had

reviewed Dr. Davakis's 2015 and 2016 treatment notes and May 23, 2016 Attending

Physician Statement, and had spoken with Dr. Davakis over the phone. (*Id.*,

PAGEID # 304–06; *see also* ECF No. 55-11.) Dr. Higgins concluded that "[o]ngoing

impairment related to claimant's alcohol abuse is no longer supported[.]" (ECF No.

55-8, PAGEID # 303.)

> **2.  Dr. Fogel — October 2, 2018**

Mr. Davis's file was again reviewed on October 2, 2018, this time by Denise

Fogel, Psy.D., ABPP. (ECF No. 55-12.) Dr. Fogel summarized Dr. Davakis's

Attending Physician Statements, and all treatment notes (by Dr. Davakis and

others, including Parkside, a urologist, a nephrologist, and an orthopedist) in Mr.

Davis's file. (*Id.*, PAGEID # 312–19.) Dr. Fogel concluded that Mr. Davis's "diagnoses of alcohol use disorder and major depression have been validated by the medical information[,]" but that "his alcohol use disorder was in sustained remission, and Dr. Davakis did not feel that the insured's mood symptoms were functionally limiting." (*Id.*, PAGEID # 319.) Dr. Fogel deferred a conclusion as to whether occupational limitations were supported by the medical records, pending receipt of updated records from Dr. Davakis and "further objective testing to help evaluate for the presence of a cognitive and/or psychiatric impairment and any associated work related limitations/restrictions." (*Id.*, PAGEID # 319–20.)

### 3. Dr. Doninger — March 15, 2019

Mass Mutual then sought an Independent Neuropsychological Evaluation (INE). Mr. Davis was examined by Nicholas A. Doninger, Ph.D., ABPP, on March 15, 2019. (ECF No. 55-13.) Dr. Doninger reviewed Mr. Davis's file, conducted a comprehensive clinical interview with Mr. Davis, and administered a series of cognitive and personality/emotional functioning tests. (*Id.*) Mr. Davis's scores on two stand-alone (Victoria Symptom Validity Test and Test of Memory Malingering) and two embedded validity tests "suggested the resultant cognitive profile was not a valid representation of his optimal cognitive abilities and was confounded by fluctuating or inadequate effort." (*Id.*, PAGEID # 327.) Accordingly, Dr. Doninger opined that the results of Mr. Davis's cognitive functioning tests were "considered of at best questionable validity and unlikely to be reliable to a greater than 50% probability." (*Id.*) On completion of his review, interview, and testing, Dr. Doninger provided the following summary of Mr. Davis's history and status:

8

Medical records and interview report documented a history of depression and anxiety, which did not result in occupational impairment prior to the current claim. These conditions were likely aggravated by a confluence of psychosocial and medical factors, including the passing of his parents and management of their estate, changes to the work environment following retirement of a senior partner, and changes to his physical health, including poorly controlled hypertension, worsening essential tremor, falls secondary to problems with blood pressure regulation, and difficulty breathing. These stressors accelerated alcohol use in a self-identified social drinker that evolved into a pattern of abuse. In turn, the increased alcohol use more likely than not aggravated his comorbid medical conditions and contributed to worsening mood and behavioral changes identified by his wife in late 2014, leading to multiple hospitalizations, treatment for alcohol use disorder, and impaired occupational functioning.

Mr. Davis has maintained sobriety since completing inpatient and outpatient rehabilitation programs in August 2015. Statements from his attending providers have indicated that his medical conditions have stabilized and are no longer a source of impairment. Complaints of ongoing cognitive impairment were not supported by credible objective data. He continues to take medication prescribed by his primary care physician to manage anxiety; however, there is no data from the current exam or in the available records to substantiate ongoing functional impairment related to anxiety or depression. Mr. Davis did not describe a literal inability to perform tasks secondary to emotional symptoms. He continues to attend AA meetings, works on both a computer and tablet at home, and performs household tasks.

(*Id.*, PAGEID # 331–32.) Dr. Doninger concluded:

I am unable to document functional impairment due to the absence of valid and reliable data regarding cognitive functioning. The results of objective personality testing supported symptoms of depression, anxiety, and a preoccupation with physical [functioning], resulting in a reduced level of efficiency; however, the level of psychiatric symptom disturbance and his clinical presentation does not support the presence of functional impairments.

(*Id.*, PAGEID # 331.)

### 4. Dr. Fogel — April 24, 2019

After Dr. Doninger completed his INE, and Mass Mutual received additional

treatment records, Dr. Fogel again reviewed Mr. Davis's claim file. (ECF No. 55-14.)

Based on a comprehensive review, Dr. Fogel opined that "ongoing limitations and

restrictions are not supported by the current clinical evidence." (*Id.*, PAGEID

# 349.) Dr. Fogel explained her reasoning:

> The collective clinical information, including recent findings from the
> March 2019 [INE] by Dr. Doninger, do not provide support for current
> cognitive or psychiatric impairment that would limit/restrict the
> insured from returning to work. The [INE] findings revealed non-
> credible objective data regarding cognitive performances. Dr. Doninger
> felt that results from emotional/psychiatric assessment were valid, but
> he assessed that the insured's level of psychiatric symptoms did not
> translate into functional impairment and associated work
> limitations/restrictions.

(*Id.*, PAGEID # 348.)

\*          \*          \*

On June 14, 2019, the Mass Mutual claim examiner assigned to Mr. Davis's

case, recorded a note to file summarizing the conclusions of Drs. Higgins, Fogel, and

Doninger. (ECF No. 55-15.) It concludes with an "assessment that it is reasonable to

conclude that Mr. Davis does not meet the eligibility requirements of total disability

contained in his disability income policy." (*Id.*)

Four days later, Mass Mutual sent a letter to Mr. Davis again summarizing

the conclusions of Drs. Higgins, Fogel, and Doninger, and advising:

> Based on all of the information available in your claim file, including
> but not limited to the information summarized above, we have
> concluded that you do not meet the definition of "Total Disability" as
> stated in your policy. As such, we have determined that you are no

longer eligible for benefits, in accordance with the terms of your
policies.

(ECF No. 55-16.)

### E.    Mr. Davis unsuccessfully appealed the decision.

On July 22, 2019, Mr. Davis sent Mass Mutual documents supporting an

appeal of his benefit termination. (ECF No. 55-17.) Those documents included:

- A letter from Mr. Davis (*id.*, PAGEID # 356–58);
- A letter from Dr. Davakis (*id.*, PAGEID # 359–60);
- A letter from Mr. Davis's wife (*id.*, PAGEID # 361–62); and
- A letter from Mr. Davis's son (*id.*, PAGEID # 363–64).

Each letter expresses disagreement with the benefit termination and urges Mass

Mutual to reconsider, but offers no additional medical evidence. Drs. Higgins, Fogel,

and Doninger reviewed the letters, but found no reason to alter their conclusions.

(ECF No. 55-18.)

Mr. Davis again appealed. (ECF No. 55-19.) Per Mass Mutual's practice, the

second-level appeal was reviewed by a three-person committee. (ECF No. 55-20.)

The review committee denied Mr. Davis's appeal on November 4, 2019. (*Id.*) In so

doing, they explained:

> Subsequent to the [INE] and closure of your claim, we received your
> letter of appeal, as well as letters from your spouse, your son, and Dr.
> Davakis. In the letter dated July 16, 2019, Dr. Davakis indicated that
> he believes your return to work as a trial attorney would likely
> exacerbate your anxiety, depression, and hypertension, with the
> potential for resumed alcohol abuse.
>
> The letters from you, your spouse, your son, and Dr. Davakis were
> forwarded to Dr. Doninger for review and the information did not alter
> his conclusion regarding the absence of credible and objective evidence
> to support occupational impairment. Our consulting physician
> reviewed the information and opined that Dr. Davakis' concern that
> your condition could worsen with return to work in a stressful

11

environment did not equate to the presence of a current occupational impairment. Our consulting neuropsychologist also reviewed the information and opined that there was insufficient evidence for cognitive or psychiatric impairment.

As part of our evaluation of the claim, we have considered the duties and demands of your occupation as a trial attorney. Our evaluation was based on information that you provided on the Insured's Statement of Occupational Description and your Curriculum Vitae. In addition, our vocational consultant completed an occupational analysis, which was based, in part, on additional data that you provided in August 2018.

In light of the medical information in the claim file, there is insufficient evidence of ongoing impairment that would prevent you from working as a trial attorney. You do not currently meet the definition of Total Disability or Residual Disability.

(*Id.*, PAGEID # 370–71.) Three months later, Mr. Davis filed the instant action. (*See* ECF No. 1.)

## II.   MOTION TO EXCLUDE TESTIMONY OF DR. CATHY DELLA MORA

The Court first addresses Mass Mutual's motion to exclude the testimony of Dr. Cathy Della Mora, proffered by Mr. Davis. (Mot. Exclude, ECF No. 56.) Cathy Della Mora, Ph.D., completed a comprehensive neuropsychological evaluation of Mr. Davis in November 2020. (Della Mora Rep., ECF No. 55-21.) The resulting report indicates that Dr. Della Mora reviewed certain unenumerated medical records and portions of the claim file, conducted a clinical interview with Mr. Davis, and administered several psychological tests. (*Id.*) Like Dr. Doninger, Dr. Della Mora administered the Test of Memory Malingering and Victoria Symptom Validity Test. (*Id.*, PAGEID # 376.) She concluded, however, that Mr. Davis's "performance on measures specifically designed to assess motivation and effort was completely within normal limits, . . . suggesting that he was putting forth satisfactory effort

during the examination." (*Id.*) Upon review of the validated test results, Dr. Della

Mora opined:

> [I]n my professional opinion, Mr. Davis is disabled from returning to
> his prior occupation as a trial attorney. The nature and variable
> severity of his deficits and combined effects of multiple contributing
> factors render him unable to effectively and competently manage the
> high level demands of a trial attorney on a consistent and sustained
> basis. The nature of this work places a high demand on areas of
> function that are most compromised in this gentleman. In particular,
> executive abilities including speed of information processing, learning
> efficiency and speed, complex information processing, multi-tasking,
> and sustained mental effort and attention are sufficiently compromised
> to render him unable to practice safely and compentently [sic].
> Although some of his neurobehavioural deficits appear relatively mild
> on assessment, they are amplified, at times significantly, by the
> combined effects of chronic mood disturbance, untreated sleep apnea
> and other medical risk factors. He has been able to circumvent his
> areas of impairment largely by considerably simplifying his daily
> routine and demands, and limiting himself to familiar and self-paced
> activities and destinations. These strategies are not compatible or
> feasible with the multiple and complex demands of practicing as an
> attorney.

(*Id.*, PAGEID # 378–79.)

Mass Mutual moves to exclude Dr. Della Mora's report from evidence on the

grounds that it fails to satisfy the standard for expert opinion testimony. (Mot.

Exclude.) The admissibility of expert testimony is governed by Federal Rule of

Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or
> otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
>     will help the trier of fact to understand the evidence or to
>     determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods;
and

(d) the expert has reliably applied the principles and methods to the
facts of the case.

The Rule incorporates the Supreme Court's instruction in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory committee's notes to 2000 and 2011 amendments. This Court serves as a "gatekeeper," tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Court is afforded "considerable leeway" both in determining *whether* to admit expert opinion testimony and *how* to test its reliability and relevance to the case at bar. *Kumho Tire*, 526 U.S. at 152. The proponent of the expert testimony bears the burden of proving its admissibility. *See* Fed. R. Evid. 104(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

The briefing on this motion leaves much to be desired. This is a federal court that applies federal law to determine whether to admit expert testimony. *Legg v. Chopra*, 286 F.3d 286, 298–90 (6th Cir. 2002) (explaining that federal law governs procedural issues in diversity actions, and the admissibility of expert testimony is "categorially . . . a matter of federal, rather than state procedure") (internal quotation and citation omitted). While Mass Mutual provides plenty of Ohio state case law on expert testimony, it provides sparse federal authority. (*See e.g.,* Mot. Exclude, PAGEID # 418–19.) But even non-precedential law is better than **no** law—which is precisely what Mr. Davis's brief offers. (*See* ECF No. 70.) Nonetheless, the

14

Court has substantial concerns about Dr. Della Mora's qualifications to render the proffered opinion.

Contrary to the requirements of the Federal Rules of Civil Procedure, Dr. Della Mora's qualifications are not included in her report. Fed. R. Civ. P. 26(a)(2)(B)(iv). In fact, her Curriculum Vitae was not produced until June 21, 2022—a month after Mass Mutual's motion to exclude was filed and a full year after the primary expert report deadline established by the Court. (ECF No. 31; ECF No. 73, PAGEID # 1722.) Mass Mutual has waived any objection to the report on the basis of untimely disclosure. *See* Fed. R. Civ. P. 26(a)(3). But, with the benefit of her CV (ECF No. 70-3), it is apparent that Dr. Della Mora is not qualified to render an opinion on Mr. Davis's ability to work as a trial attorney.

As the Sixth Circuit has explained, "the key question" before the Court "is not the expert's general qualifications in some field, but whether the precise question on which [she] will be asked to *opine* is within [her] field of expertise[.]" *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (emphasis in original) (quoting *United States v. Kozminski*, 821 F.2d 1186, 1219–20 (6th Cir. 1987), *aff'd in part and remanded in part*, 487 U.S. 931). Dr. Della Mora is an experienced clinical neuropsychologist. (*Id*.) She holds a Bachelor's degree in psychology, Master's degrees in counseling psychology and gerontology, and a Doctorate in psychology with specialization in clinical neuropsychology. (*Id*.) Since 1998, she has operated a clinical neuropsychology practice, in which she conducts "[c]linical neuropsychological evaluations and consultations for outpatient populations,"

practices "therapeutic rehabilitation and psychotherapy," writes "evaluation reports to referral sources," provides "feedback to patients and family members," and supervises psychometrists. (*Id*.) But she has no disclosed experience or training that would equip her to opine on Mr. Davis's capacity to carry out the duties of a trial attorney. She has not, for example, studied vocational assessment or analysis, or worked in legal job placement. It is unclear what Dr. Della Mora understands to be the duties of a trial attorney, or how she developed any such understanding. It is further unclear what Dr. Della Mora believes Mr. Davis can or cannot do—her opinion is not framed in terms of functional limitations but, rather, Mr. Davis's ability to practice law "safely, "effectively," and "competently." Mr. Davis has failed to prove that Dr. Della Mora has any scientific, technical, or other specialized knowledge enabling her to provide such an opinion.

Mass Mutual's Motion to Exclude Testimony of Cathy Della Mora (ECF No. 56) is **GRANTED**.

## III.   MOTION FOR SUMMARY JUDGMENT

Mass Mutual next argues that it is entitled to judgment as a matter of law on Mr. Davis's claims for breach of contract, breach of the duty of good faith, and promissory estoppel. (Mot. Summ. J.) The Court agrees.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v.*

16

*Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## A.     Count One — Breach of Contract

In Count One, Mr. Davis alleges that Mass Mutual breached the Policy when it terminated his benefits. Under Ohio[1] law, a breach-of-contract claim requires the

---

[1] This case is before the Court on diversity jurisdiction. *See* 28 U.S.C. § 1332. "[F]ederal courts sitting in diversity apply the substantive law of the forum state and federal procedural law." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing, *inter alia*, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1939)). "When an insurance contract predicated upon diversity jurisdiction is before [the] Court, the substantive law of the forum state, the state in which the lawsuit was filed, must be applied." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Paterson*, 417 F. Supp. 3d 888, 893 (N.D. Ohio 2019) (citation omitted).

plaintiff to prove that (i) a contract existed, (ii) the defendant "fail[ed] without legal excuse . . . to perform when performance [was] due," and (iii) the plaintiff was damaged by that failure. *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018). Insurance policies are construed like any other written contract. *Scott v. Allstate Indem. Co.*, 417 F. Supp. 2d 929, 932 (N.D. Ohio 2006). "The court's role in interpreting a contract is to give effect to the intent of the parties." *Fujitec Am., Inc. v. AXIS Surplus Ins. Co.*, 458 F. Supp. 3d 736, 743 (S.D. Ohio 2020) (Litkovitz, M.J.) (quotation omitted). To give such effect, "[c]ontract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *CoMa Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (citations omitted); *see also Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

The crux of this dispute is whether Mass Mutual breached the terms of the Policy when it determined that Mr. Davis was no longer entitled to Total Disability benefits. The Policy provides Total Disability benefits when, "because of sickness or injury, [the insured] can't do the main duties of [his] occupation." (Policy, PAGEID # 229.) But those benefits are available *only* "as long as [the insured is] totally disabled." (*Id.*) To carry out that provision, the Policy requires the insured to submit "proof of [his] disability" and, submit to examination "from time to time." (*Id.*, PAGEID # 231.) It frames these additional obligations as "things [the insured] must

18

do when making a claim" for benefits. (*Id*.) In other words, the Policy requires the insured to substantiate his entitlement to benefits *even after* benefit payments have commenced.

Mass Mutual argues that, by the time his benefits were terminated, the objective medical evidence no longer showed that Mr. Davis's impairments resulted in any occupational limitations. The record supports that conclusion. By 2019, Dr. Davakis's treatment notes indicate that Mr. Davis reported "mild cognitive issues" but that he was "otherwise . . . fairly stable." (*See, e.g.*, ECF No. 69-4, PAGEID # 1523.) But, except for the MMSE score, Dr. Davakis's notes on those cognitive issues appear to be a record of Mr. Davis's own subjective reports. And, despite Dr. Davakis making a referral, Mr. Davis never consulted with a neurologist. Drs. Higgins and Fogel both opined, upon review of Mr. Davis's medical file, that neither his physical nor psychiatric impairments resulted in occupational limitations. Dr. Doninger's INE results align with the others' opinions.

Mr. Davis's only opposing evidence is the letter Dr. Davakis drafted in support of his appeal.[2] That letter expresses Dr. Davakis's disagreement with Mass Mutual's decision to terminate Mr. Davis's benefits, but not because he believed Mr.

---

[2] Although Mr. Davis's response purports to argue that Mass Mutual waived the requirement to provide ongoing proof, he provides no substance for the argument. (*See* ECF No. 69, PAGEID # 1474–75 (arguing, in section partly titled "Mass Mutual, through its conduct, waived [ongoing proof] requirement," that Mr. Davis provided ongoing proof of his disability).) "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted).

Davis was presently disabled—instead, he "believe[d] that placing Mr. Davis back in the extremely stressful position of a trial attorney would very likely exacerbate" his impairments, leading to relapse. (ECF No. 55-17, PAGEID # 359.) But, as Mass Mutual points out, the risk of relapse alone is not necessarily disabling. (*See* ECF No. 72, PAGEID # 1761.) In fact, the Policy contemplates that certain disabling conditions may resolve and recur—and pays benefits in those cases accordingly. (Policy, PAGEID # 229 (defining Recurring Disability as "a related disability that starts less than 6 months after a period of total or partial disability").) Mr. Davis thus fails to establish a genuine issue for trial as to whether Mass Mutual breached the Policy.

Mass Mutual's Motion for Summary Judgment is **GRANTED** as to Count One.

### B.    Count Two — Breach of Duty of Good Faith

In Count Two, Mr. Davis alleges that Mass Mutual breached its duty of good faith. Although the Court grants judgment to Mass Mutual on Count One, "Ohio law recognizes that bad faith in the adjustment of an insurance claim may exist without a valid claim for coverage." *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 501 (6th Cir. 2007) (citing *Staff Builders, Inc. v. Armstrong*, 525 N.E.2d 783, 788 (Ohio 1988) and *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 397 (Ohio 1994)). Under Ohio law, "an insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983). "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not

20

predicated upon circumstances that furnish reasonable justification therefor."
*Zoppo*, 644 N.E.2d at 397.

Mass Mutual was reasonably justified in terminating Mr. Davis's benefits.
Dr. Higgins first opined in June 2016 that Mr. Davis's medical records no longer
supported occupational limitations. (*See* ECF No. 55-8.) Three years later, after the
objective testing conducted by Dr. Doninger failed to support ongoing limitations,
Dr. Fogel agreed. (*See* ECF No. 55-14.) Only then did Mass Mutual close Mr. Davis's
claim. Mr. Davis was later afforded two levels of appeal, but he produced no
additional medical evidence supporting occupational limitations.

In response, Mr. Davis again invokes Dr. Davakis's letter to argue that Mass
Mutual "ignored" medical evidence supporting his claim. (*See* ECF No. 69, PAGEID
# 1481.) But the record betrays his position. In her April 24, 2019 Doctoral Claim
Review, Dr. Fogel summarized each of Dr. Davakis's treatment notes and Attending
Physician Statements—including the recorded cognitive issues. (*See* ECF No. 55-
14.) Further, the determinations on appeal reflect that Drs. Higgins, Fogel, and
Doninger reviewed and considered Dr. Davakis's letter and declined to change their
conclusions. (ECF Nos. 55-18, 55-20.)

Absent any evidence of bad faith, Mass Mutual's Motion for Summary
Judgment is **GRANTED** as to Count Two.

### C.    Count Three — Promissory Estoppel

In Count Three, Mr. Davis alleges that Mass Mutual is estopped from
terminating his disability benefits. Mass Mutual moves for summary judgment.

Under Ohio law, "[p]romissory estoppel is not applicable where the parties' claims are governed by a valid contract." *Right-Now Recycling, Inc. v. Ford Motor Credit Co., LLC*, 644 F. App'x 554, 558 (6th Cir. 2016) (collecting cases); *see also Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 699 (S.D. Ohio 2012) (Smith, J.) (explaining that "Ohio law does not allow parties to seek damages under quasi-contractual theories of recovery . . . when a contract governs the relationship") (internal quotation and citation omitted). Here, the Policy governs. Mr. Davis does not dispute its validity or enforceability. Accordingly, his promissory estoppel claim fails as a matter of law.

Mass Mutual's Motion for Summary Judgment is **GRANTED** as to Count Three.

## IV.  MOTION TO EXCLUDE TESTIMONY OF J. ROBERT YOHMAN

Finally, Mr. Davis moves to exclude the testimony of Mass Mutual's expert, J. Robert Yohman. (ECF No. 76.) Mass Mutual moves to strike Mr. Davis's motion to exclude. (ECF No. 77.) Because Dr. Yohman's report (cited nowhere herein) is unnecessary to the disposition of this matter, the motions are **DENIED as moot**.

## V.    CONCLUSION

For the reasons set forth above, Mass Mutual's Motion for Summary Judgment (ECF No. 55) is **GRANTED**. Furthermore, Mass Mutual's Motion to Exclude Testimony of Cathy Della Mora (ECF No. 56) is **GRANTED**. Mr. Davis's Motion to Exclude Testimony of J. Robert Yohman (ECF No. 76) and Mass Mutual's Motion to Strike Mr. Davis's Motion to Exclude (ECF No. 77) are **DENIED as moot**.

The Clerk is **DIRECTED** to **TERMINATE** this case from the docket.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**